# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs March 8, 2011

## STATE OF TENNESSEE v. DAVID ENRIQUE LEON

**Direct Appeal from the Circuit Court for Dickson County**
**No. 22CC-2008-CR-635     Robert Burch, Judge**

---

**No. M2010-00513-CCA-R3-CD - Filed August 18, 2011**

---

A Dickson County Circuit Court jury convicted the appellant, David Enrique Leon, of first degree felony murder and aggravated robbery, and the trial court sentenced him to consecutive sentences of life and ten years, respectively. On appeal, the appellant contends that the evidence is insufficient to support the convictions. Based upon the record and the parties' briefs, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court are Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and JOHN EVERETT WILLIAMS, J., joined.

William B. "Jake" Lockert, III (at trial and on appeal), and Dawn Kavanaugh and Kathleen Mitchell (at trial), Ashland City, Tennessee, for the appellant, David Enrique Leon.

Robert E. Cooper, Jr., Attorney General and Reporter; Nicholas W. Spangler, Assistant Attorney General; Dan Mitchum Alsobrooks, District Attorney General; and Billy Henry Miller, Jr., Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### I.  Factual Background

At trial, Ridia Padilla testified that the victim, Rodolfo Padilla, was her father. The victim and his family operated the La Estrella Grocery Store on Highway 46 in Dickson, and

an Auto Zone was beside the store. Ridia[1] often worked at the store and was familiar with its layout. She said that a person standing near the thermostat in the store would not have been able to see the cash register at the front because shelves blocked the view. However, a person standing between the shelves would have been able to see the front of the store. About 7:30 p.m. on March 25, 2006, Ridia telephoned her parents at the store and spoke with them. About 10:30 p.m., she learned something had happened to the victim. She went to Vanderbilt Hospital about 11:00 p.m., and the victim was still alive.

Dr. Feng Li, the Assistant Medical Examiner for Metropolitan Nashville and Davidson County, testified that he witnessed the victim's autopsy on March 27, 2006. The victim had a gunshot wound near his left eyebrow and died of a gunshot wound to the head. Powder tattooing around the wound indicated that the muzzle of the gun was two and one-half to three feet away from the victim when it was fired. The bullet, a small to medium caliber, traveled front to back, upward, and slightly left to right. It penetrated the victim's left eyelid, traveled into the brain, and came to rest behind the victim's left eye. On cross-examination, Dr. Lee testified that the muzzle of the gun could have been only inches away from the victim when it was fired.

Madel Padilla testified through an interpreter that she married the victim in 1982 and that he opened the La Estrella Grocery Store in 2003. On March 25, 2006, Madel and the victim were working at the store. About 6:30 p.m., Madel went to a small room in the back of the store to take a nap. The victim woke her at 7:50 p.m., and she went to the front of the store with him. She said that at 8:00 p.m., the victim told her, "[L]et's go it's late." Madel walked to the thermostat toward the back of the store in order to turn off the air conditioner. She said she heard the front door open and heard a voice say in English, "[T]his is a robbery." She could not see the victim because shelves were blocking her view, but she could see the robber's hand holding something. She said that she heard a gunshot "practically at the same time as the words" and that she tried to get out of the store because she was afraid the robber would shoot her too. She went out the back door and re-entered the store through the front door. The victim was lying on the floor behind the sales counter, and blood was coming out of his nose. Madel telephoned 911, and the police and paramedics arrived.

At first, Madel testified that she only saw the robber's arm, not his face. However, she later said she saw "a little bit of him on his face on the side, just a little." The robber took the money the store had collected that day, $6,700 to $6,800, and part of the previous day, $5,000 to $5,500. The victim was disconnected from life support on March 26.

---

[1]Because some of the witnesses share a last name, we will refer to them by their first names for clarity.

On cross-examination, Madel testified that she heard only one voice and saw only one robber. However, she said she thought more than one person was involved in the robbery because "if he had been the one who fired the gunshot and then gathered together the money I would have seen him upon my return to the store and leaving the store." She acknowledged that she told the police she saw one black male. However, she explained, "Yes, I told them, but I was in panic but I did tell them that it was like a person with a dark skin, dark skin." She said she meant the robber was dark-skinned, not black. She said that when the police asked her if the robber could have been Hispanic, she told them "no or I didn't know." She said the robber had a large arm, was tall, and had a "plump" face. Defense counsel requested that the appellant stand up and asked Madel, "[I]s this a tall, large framed person?" Madel answered, "He might have been larger but if he was as thin as he is now, no." Defense counsel also asked, "So you're saying this is a tall, dark man?" Madel said, "Well, more of a tan skinned - more of my color but, maybe, more darker." She denied telling the police that she was stocking shelves at the time of the robbery.

Deputy Paul Montgomery of the Dickson County Sheriff's Department testified that on the night of March 25, 2006, he was on patrol and was stopped at the traffic light in front of the Auto Zone on Highway 46 in Dickson. He said he could see the La Estrella Grocery Store and heard a "priority one call" for the City of Dickson Police Department. Deputy Montgomery pulled up to the store, looked inside, and saw a distraught woman behind the sales counter. He went inside and saw a man lying behind the counter. He could not understand what the woman was saying but saw that the man had a wound to his upper face or forehead. The store's back door was partially open, and a spent bullet casing was on the floor near the front entrance. Deputy Montgomery also saw money on the counter and on the floor. He said that it would have taken the robber only three to four seconds to have traveled from the front door to the sales counter and back to the front door. On cross-examination, Deputy Montgomery testified that a person could have fired the gun and exited the store within seconds.

Special Agent Dan Royce of the Tennessee Bureau of Investigation's Firearms and Tool Mark Identification Unit testified that he went to the La Estrella store in the early morning hours of March 26. Upon entering the store, the front sales counter was to the left and seven feet from the front door. A Winchester .25 caliber automatic spent cartridge case, a telephone calling card, and money were on the floor. The location of the cartridge case was consistent with someone's having fired the gun over the counter. Agent Royce tested the cartridge case. However, he was unable to match the cartridge case or the .25 caliber bullet recovered from the victim to any particular gun because no weapon was recovered. He said that a person standing one meter west of the thermostat would have had "a direct line of sight to some of the front door."

Twenty-eight-year-old Alex "Diablo" Gonzales testified through an interpreter that on March 25, 2006, he and the appellant were in an apartment in Nashville. Sergio Hernandez arrived, and the three of them decided to rob the La Estrella Grocery Store. They got into Hernandez's green four-door vehicle and drove to Dickson. Hernandez parked behind the Auto Zone, and Gonzales and the appellant got out and walked to the grocery store. The appellant had a .25 caliber gun, and Gonzales had a .38 caliber gun. The appellant walked into the store first. Gonzales said he entered the store just as the appellant was telling the store owner "that it was a robbery." Gonzales said he saw the appellant lean over the counter and shoot the victim, who was standing behind the counter and was counting money. Gonzales said the gun was one and one-half to two feet away from the victim when the appellant shot the victim. The victim fell to the floor, and Gonzales asked the appellant, "[W]hat have you done?" The appellant wanted to run, but Gonzales stopped him. Gonzales went behind the counter and started picking up money. By the time Gonzales finished gathering the money, the appellant was gone. Gonzales said that he only picked up the money that fell out of the victim's hands, $3,300, and that he was in the store for only a few seconds. He returned to Hernandez's truck, where Hernandez and the appellant were waiting. He said that the three of them returned to the apartment in Nashville, that they "split" the money, and that he received $1,100. After the robbery, the appellant shaved his head.

Gonzales testified that his gun was in his pocket when he entered the grocery store and that he never took it out of his pocket because "it wasn't necessary." He and the appellant entered and exited the store through the front door, and Gonzales did not see anyone other than the victim in the store. When Gonzales returned to Hernandez's vehicle after the robbery, the appellant told him the shooting had been an accident. Gonzales was angry with the appellant for the shooting, took the appellant's gun, and returned the gun to the appellant when they got back to the apartment in Nashville. Gonzales was charged in federal court for his involvement with the La Estrella robbery and other crimes. He pled guilty but had not been sentenced at the time of the appellant's trial. He said that as part of his federal plea agreement, he was required to tell the truth.

On cross-examination, Gonzales testified that the appellant was about three feet away from the victim at the time of the shooting. After the shooting, the appellant waited for Gonzales by the front door. Gonzales said that he walked behind the counter to get the money and that the appellant "took off." He said he did not know before the robbery that the victim was going to be shot, and he denied shooting the victim. He also denied giving the .25 caliber gun to the appellant after the robbery and telling the appellant to take the blame for the shooting. He acknowledged that in addition to being charged in this case, he was convicted of robbing and shooting the owner of the Express Market in Madison with "Acapulco" Carlos Fernandez and Sergio Fernandez. He also acknowledged that he been

charged with crimes for his involvement in the robberies of the La Espiga Bakery, the Discoteca Mexico, and the Tienda Mexicana. He denied putting his hand up to his head and motioning like a pistol during a recess in the appellant's trial.

Sergio Reyes Hernandez testified through an interpreter that on March 25, 2006, he, Alex Gonzales, and the appellant were at a friend's home in Nashville. They were using cocaine and marijuana and drinking alcohol. They decided to rob the La Estrella Grocery Store, and Hernandez drove them to Dickson in his 1995 Ford Explorer. He said that he parked beside the Auto Zone and that they "shot some cocaine and stayed there a few minutes." Then the appellant and Gonzales went into the grocery store while Hernandez waited in his vehicle. The appellant and Gonzales returned to the Explorer two or three minutes later, and Hernandez did not remember which man returned first. He said that they got into his vehicle, that he drove them back to Nashville, and that no one said anything about the robbery at that time. At some point, the appellant said he accidentally shot the victim. Gonzales appeared to be mad at the appellant for the shooting. The three men divided the money and used it to buy drugs. The next morning, Hernandez saw the appellant, and the appellant had cut his hair or his mustache. Hernandez acknowledged that he had been charged in federal court with five crimes related to robberies, kidnappings, and carjackings. He pled guilty to the crimes but had not been sentenced at the time of the appellant's trial. He said that in exchange for testifying truthfully against the appellant, he was hoping to spend less time in prison.

On cross-examination, Hernandez testified that at the time of the robbery, he had known Gonzales since they were small boys in Mexico but had known the appellant for only one month or less. Before the robbery, Hernandez, Gonzales, and the appellant had been at Acapulco Carlos' apartment. He said Carlos was about six feet tall. Hernandez acknowledged that he told the appellant and Gonzales that he thought the La Estrella store would be a good place to rob.

Special Agent Bret Curtis of the Federal Bureau of Investigation testified that he was fluent in Spanish and interviewed the appellant on September 4, 2007, about the appellant's involvement with the La Estrella robbery. Agent Curtis read Miranda warnings to the appellant, and the appellant signed a waiver of rights form. He said that the appellant was very cooperative during the interview and that the appellant apologized for killing the victim. The appellant wrote a statement in Spanish, and Agent Curtis translated it into English. He read the translated statement to the jury. According to the appellant's statement, Sergio "Chato" Hernandez told the appellant and Alex "Diablo" Gonzales about a store "that would be very easy to rob." The appellant, Hernandez, and Gonzales drove to the store in Hernandez's green Ford Explorer. The appellant entered the store, followed by Gonzales, and told the owner it was a robbery. The appellant said in the statement that "'without

-5-

wanting to and without thought a bullet got away from me and the man fell to the ground.'" The appellant was scared and ran while Gonzales picked up the money. They returned to Hernandez's vehicle, drove back to Nashville, and "split" the money. The appellant said in the statement that they never intended to hurt anyone and that he was sorry for shooting the victim. Agent Curtis said that the interview lasted about one hour, that he did not promise the appellant anything in return for the confession, and that he did not threaten the appellant.

On cross-examination, Agent Curtis testified that he thought the appellant's story was true. He said he did not tell the appellant that the appellant was facing the death penalty. He said that he was nice to the appellant and that he did not use any tactics to get the appellant to confess. He did not video- or audio-record the appellant's interview.

Deputy Robert Estes of the Dickson County Sheriff's Department testified that in August 2009, he was working as a corrections deputy in the Dickson County Jail. He said that during a security check on August 18 or 19, he discovered that the security bar on the appellant's cell window had been "sawed out" and that the window had been cracked and broken. He said that the appellant was the only person in the cell and that he found a hacksaw blade hidden in a crack in one of the cell's walls. On cross-examination, Estes testified that the window in the appellant's cell was eighteen inches tall and about thirty-six inches long.

Virginia Knox, a translator for the City of Dickson Police Department, testified for the appellant that Madel Padilla gave a statement to a police officer soon after the robbery and that she translated Madel's statement into English. Knox reviewed the statement with Madel, and Madel signed it.

On cross-examination, Knox testified that she and Madel were sitting in a police car when Madel gave the statement and that Madel was crying and shaking. Knox stated that Madel told her the following:

> "[S]he was going back to the refrigerator, she was getting some cold drinks or something like that; and then she heard a noise in the front of the store, and she heard a shot. After the shot then she came around and she hid in the back, she was afraid. And she hid in the back. She went around the counter and she saw a heavy set . . . man with dark skin that appeared to be black or black in color. He was bending over the counter and she said I did not see his face. And so, she went to the back door and ran around the building to see if she could see because she was afraid to go into the front door. She thought she was going to be

shot herself, so she was really afraid."

Knox stated that Madel did not tell her Madel heard someone say, "[T]his is a robbery." Knox acknowledged that some people from Mexico had very dark skin. Madel told Knox the robber appeared to be black, but Madel did not know if the robber was black.

Dawn Kavanaugh, one of the appellant's trial attorneys, testified for the appellant that at the conclusion of Alex Gonzales' testimony, she saw Gonzales gesture to the appellant in what she thought was a "very threatening [manner]." She said that Gonzales "gestured with his hand like this to his head" and that she immediately reported the incident to the prosecutor.

On cross-examination, Kavanaugh acknowledged that Gonzales's hands were shackled together and to his waist. She said that the incident occurred as the jury was exiting the courtroom and that three or four deputies were around Gonzales at the time. She said that Gonzales was sitting down, raised up his hand, put his head down, and made the gesture.

Jake Lockert, another trial attorney for the appellant, testified that he also saw Gonzales "with his hands making a pistol gesture towards his head." He said that Gonzales looked directly at the appellant when Gonzales made the gesture and that Gonzales "glared" at the appellant. As Gonzales left the witness stand and was being led out of the courtroom, he continued to glare at the appellant. Lockert said Gonzales walked by the appellant, looked at the appellant, and "did his finger like a pistol towards him." He said Gonzales also "mouthed" something to the appellant.

Steven Rychlik testified on rebuttal for the State that he was the court officer responsible for security during the appellant's trial. He said he had been present throughout the trial, including while Alex Gonzales was testifying and being escorted out of the courtroom. He said he did not see Gonzales make any gestures toward the appellant. On cross-examination, Rychlik testified that he saw Gonzales look toward the appellant a couple of times but that he did not see Gonzales mouth anything. The jury convicted the appellant of first degree felony murder and aggravated robbery.

## II. Analysis

The appellant contends that the evidence is insufficient to support the convictions because the evidence shows that Alex Gonzales, a dark-skinned Hispanic male, committed the crimes; gave the murder weapon to the appellant, a fair-skinned man, after the robbery; and intimidated the appellant into giving a false confession. The State argues that the evidence is sufficient. We agree with the State.

When an appellant challenges the sufficiency of the convicting evidence, the standard for review by an appellate court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e). The State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. See State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions concerning the credibility of witnesses and the weight and value to be afforded the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh or reevaluate the evidence, nor will this court substitute its inferences drawn from the circumstantial evidence for those inferences drawn by the jury. See id. Because a jury conviction removes the presumption of innocence with which a defendant is initially cloaked at trial and replaces it on appeal with one of guilt, a convicted defendant has the burden of demonstrating to this court that the evidence is insufficient. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

Taken in the light most favorable to the State, the evidence shows that on the night of March 25, 2006, the appellant, Alex Gonzales, and Sergio Hernandez decided to rob the La Estrella Grocery Store in Dickson. They drove to the store, where Hernandez parked beside the Auto Zone. The appellant and Gonzales walked to the store, and the appellant went inside, followed by Gonzales. As soon as the appellant entered the store, he pointed a gun at the victim, announced a robbery, and shot the victim, who had been counting money. After the shooting, Gonzales went behind the sales counter and gathered the money. The appellant claims that he could not be the robber Madel Padilla saw because he is not dark-skinned. However, the jury, not this court, was in the best position to view the appellant, the witnesses, and the evidence. Moreover, although the appellant contends Gonzales intimidated him into making a confession, the appellant's version of events in his statement to Agent Curtis is strikingly similar to the accounts given by Gonzales and Hernandez at trial. The evidence is sufficient to support the convictions.

### III. Conclusion

Based upon the record and the parties' briefs, we affirm the judgments of the trial court.

_____
NORMA McGEE OGLE, JUDGE